Chicago Metropolitan Fire Prevention Company at Ball. On behalf of the Avalon, Mr. Robert Chenners. On behalf of Kathleen Lisle-Woodridge, Mr. Bernie Weiler. On behalf of Chicago Metropolitan Fire, Mr. Kevin Crews. And I understand that Mr. Weiler and Mr. Crews,    in the Chicago Metropolitan Fire Department. have reached an agreement about how to separate or split their time. That is correct. Subject to our questions and keeping you beyond the time. All right. With that, Mr. Chenners, when you are ready, you may proceed. Good morning, Your Honors. May it please the Court, Counsel, for the Plaintiff Appellant to American Alternative Insurance Corporation, Robert Chenners, with my associate, Peter Sergelis, on the brief. Your Honors, a few housekeeping matters. This is an appeal on cross motions for summary judgment from the DuPage County Circuit Court. It's de novo review, as Your Honors know. If time doesn't permit me to argue each of the issues we've raised in our brief, I will stand on the brief and I in no way waive anything. Also, I will reserve a few minutes for rebuttal as to the two appellees. The briefing in this case has been quite extensive. The record is quite extensive. You may have wondered how long the bench trial was, when the 2,700-page record was brought to your chambers, only to find out it's on a motion. The policy is over 200 pages long, which may be part of the reason why the record is so long. Having gone through that, there is one thing that's clear. The parties appear to agree on one thing, and that is that there is no coverage for the District and Chicago Metro if the enactment of the ordinance in 2009 that led to the termination of the contracts the alarm companies had with more than 400 customers within the District was certain to give rise to a claim for damages. I say the parties agree to that because Chicago Metro, on page 27 of its brief to this Court, says there is coverage unless the insured expects or intends that the act will result directly in damages to others. The District says, on page 23 of its brief, almost as if they wrote them together, that whether or not the insured expected or intended the act to result in money damages is the issue. That having been said, the District takes a different tack than does Chicago Metro. Let me ask one question before you get to their differences. And I've read these several times. In your opening brief, do your opening brief and your reply brief match? Are you talking about the same intention? To me, it appears that you are saying the intentional act being the adoption of the ordinance is the problem, but you seem to change your direction and say that it's not the intentional act, but it's the unexpected or unintended damages. Now, which is it? It's the latter. It is the damage. This policy has a definition of wrongful act which is probably unlike any, at least our research has indicated this Court has dealt with before this case. It covers neglect or breach. It covers malfeasance, nonfeasance, or misfeasance. But what it doesn't cover is conduct which leads to expected or intended damages to others. You can have intentional conduct, and there is no question that each iteration of the verified pleading here, the original complaint and the supplemental complaint, are rampant with allegations of intentional conduct and intent to harm. That's the focus of our position as to the error of the trial court. The District says, in a rather bewildering portion of its brief, that there is a difference between damage and damages. It points to a panel in this Court's decision in Giammanco, a tort case, saying damage is injury or harm, but damage is compensatory damage. They ignore the Supreme Court decision in Alport Marine v. Liberty Mutual where the Supreme Court, 154 Illinois 2nd, 90 at 116, said in a liability policy you have damages from a court of law which would be compensatory damages,  So then we need to decide, based on that clarification about intentional not being excluded from the policy, do we need to decide whether the District's actions unexpectedly and unintentionally gave rise to the alarm company's damages? That is correct. Your Honor, on this record, with the allegations, in the two iterations of the complaint, we think they determined a decision that on the face of that complaint, that the defendants did not know what they were doing, that the defendants did not know to a certainty that their conduct would cause damage is an absurd position. After all, until the ordinance in 2009 was enacted, there were 800 commercial entities that had contracts with various alarm companies within the Lyle-Woodridge Fire Protection District. As of the enactment of that ordinance, notices were sent to all 800, 400 of which had contracts with the five plaintiffs in the underlying federal action, telling them that as of the enactment of this ordinance, their contracts with these alarm companies were, quote-unquote, null and void. Bear in mind, that's what the Seventh Circuit called, in the first ADT opinion, described that ordinance, that notice, I should say, as the invitation to file the lawsuit. So what are you saying? That the district could have reasonably anticipated that there'd be an economic impact on the alarm companies? Economic impact? Their contracts were over. 400 contracts, 300 of which were by one of the five plaintiffs with 300 different customers, declared null and void because the district decided it and Chicago Metro, from that point forward, would handle the wireless fire alarm transmission and monitoring function, which before had been done by independent alarm companies. Now, the independent alarm companies were out. Chicago Metro was in. The bid was given to Chicago Metro because Chicago Metro, although they're going to portray themselves as an innocent bystander, actively encouraged and suggested and orchestrated to the district that it implement this ordinance for the reason that it would create a new source of revenue, monitoring fees, which the district up until that point had not had. Well, assuming there is insurance coverage or insurance duty to defend, doesn't that argument include them as an additional insured? Well, to be an additional insured on this policy, there's a blanket definition. It's not even an endorsement. It's a definition, and basically, if you look at it, it says, any organization liable for the wrongful acts committed or alleged to have been committed by the district is an insured, but only to the extent of that liability. You will hear the defendant say, Chicago Metro said, well, we were sued because of what the district did. Therefore, we're entitled to coverage. But that's not what that language says. That language requires the additional insured to be two things, neither one of which Chicago Metro can say it is, responsible but blameless. There are a legion of cases in this state on additional insured endorsements. A typical additional insured endorsement or definition like this one does not increase the risk of the insurance company. But isn't most of the language in the complaints we're talking about, Chicago Metro in concert, Chicago Metro as a conspirator, I think there's one allegation. So they're always taken together for purposes of this litigation. Well, but again, Your Honor, if you look at that complaint, nowhere within the 145 paragraphs of either iteration of these verified plaintiffs will you find an allegation of vicarious liability. Nowhere will you find an allegation or elements of a joint venture. They allege a conspiracy. They allege as to Chicago Metro that it orchestrated, encouraged, and suggested that a new revenue stream be had by the district through the implementation and enactment of the ordinance and that it was actively involved. The old saying is it takes two to tango. You can't enter into a conspiracy without an active act. You can't enter into a conspiracy accidentally. The interesting thing about this case, when you look at this, you're going to say, this is not like any insurance case we've looked at. This is a business decision gone bad. And it's not some group of parties. All right. Let's go back to that. Who's making this business decision? It is a group of elected officials in the Lyle Woodridge Fire Protection District. What particular expertise do they have in this field? I don't know what expertise they have. Chicago Metro is the expert. They're the ones who suggested that this be done. They're the ones who, according to paragraph 50 of each complaint, suggested it to this district and other districts that they control the wireless fire alarm transmission and monitoring function, which before had been done by a number of different alarm companies, five of whom gathered together and filed suit in federal court with respect to 400 of the 800 commercial accounts in the district. Your brief focuses on the fact that it's a cash count. We'll use that term. You don't use it, but I do. I don't. However, Chicago Metro also does propose other issues, including less false alarms, better protection issues. Isn't that also true? You don't emphasize much of that in your brief. We don't because it's not alleged. It's not alleged in either complaint that was filed against Chicago Metro. We thought it best to limit ourselves to what this court in Pekin v. Precision Doe said you were to look at, the eight corners, the four corners of the policy, the four corners of the complaint, and really nothing else, but you can look at other things. And we suggested to the circuit court that he look at other things, and he didn't. And we appealed that aspect of his ruling, unlike the district, where we had the district's affidavit stricken and they did not appeal that part of the ruling. But we suggest under Pekin v. Precision Doe, that was decided just a few years ago by a panel of this court, that the court could look at anything that would be looked at on summary judgment, especially something where, as here, there's no fear of either race judicata or collateral estoppel because there's no likelihood that the circuit court can make a finding that is somehow significant to the underlying case. That was already made. Judge Shader made that in the federal court and the Seventh Circuit affirmed. Right after this case was decided, the Seventh Circuit affirmed the second injunction amended by Judge Shader. Okay. You've talked about the first ordinance and the first notice. Then there's a second notice, and then there's a second ordinance. Correct. That significantly changed what happened in first ordinance, first notice, second notice. Well, according to the Seventh Circuit's second ADT decision, it really did. And the injunction that had been issued following a four-day evidentiary hearing in the trial court, in federal court, was affirmed by the judgment to enjoin the monopoly that had been created was affirmed. What the court said is the district has the power to do what it did, that is to say, to enact the ordinance, but it didn't have the power to make itself and another the sole provider of the alarm transmission and monitoring implements, parts, service, monitoring, and all the things that went with it. Because what had happened here? I think it's unmistakable. If you look at the notice that they sent, they eliminated competition within the district. They got rid of the alarm companies and Chicago Metro took over whatever the alarm companies was doing. It became the exclusive entity that could install or maintain the fire alarm transmission devices at these businesses, which before had been the business of the five other alarm companies that are the plaintiffs and anyone else. However, the property owners under the 2012 ordinance could contract with private companies for their transmission and monitoring, right? Pardon me, Your Honor? Under the 2012 ordinance, the property owners could contract with private companies for the fire alarm transmissions and monitoring and the necessary equipment, correct? And pay the village the monitoring fee, correct? The district, I'm sorry. This is a situation where one would look at it and say this is a business decision gone bad, and it's not something that is typically the subject of insurance. An insurance policy is an aleatory contract. It is a contract based on fortuity and risk. What they were dealing with here and what the circuit court dealt with here in looking at the allegations was a certainty. When a district issues a notice to 800 commercial customers telling those customers that if you have contracts to monitor your alarm system, those contracts are now null and void. It creates a loss for the alarm companies. It's unmistakable. It's unassailable. It's uncontrovertible. They lost. But that's over. That one's over. That's what the losses are about. Well, there's a second. There's the 2012 ordinance that's also in play here. And where in the pleadings or where anywhere does it say that the district and Chicago met? Well, let's just talk about the district. The district knew that with the new conditions that, you know, Barnes & Noble, you can keep ADT, but you have to use our Keltron transmitter. How did the district know that the Keltron transmitter would not be compatible with ADT's equipment for purposes of this new deal in 2012? Well, I looked at the allegations of the supplemental verified complaint, and they basically mirror what's in the initial complaint, except they expand on certain aspects of it because of the nature of the adjunctive relief that had gone before that. The essence of it is still the same. It's anti-competitive. It created damage to the alarm companies. If it were, as the court has described, the alarm companies would have nothing to complain about, and they obviously still do. In fact, the second iteration of their complaint is longer than the first one. It has more in it. Well, now there's an allegation that they can't work together because their systems aren't compatible with Keltron or something of that nature. But where – I mean, the issue is this is a duty to defend, correct? Correct. So where in those pleadings does it say that – or is it alleged that the district knew that the individuals in the commercial properties who have private companies contracting for their security and their alarm system could not work with, or they had reason to know, to expect, with certainty, that they couldn't work together? Well, I don't know if it says with certainty. Well, that's how you started your definition. Certainly. They knew or should have known that the enactment of the ordinance and the enactment of the second ordinance would create damage to the alarm companies. And we submit that if the court looks at those allegations, that's what's alleged, that they knew or should have known. And the damage that was caused on this record is a certainty. There is no risk. This is not what insurance is designed for. And when the circuit court reviewed this – and I understand the circuit court wrote an opinion in a letter to counsel, which is great. I respect when a circuit court takes the time to express his or her thoughts in connection with a summary judgment, even though this court wrote said it de novo. And if the result is correct, then the rationale to get to that result is really irrelevant. It's as long as the result is correct and the court can affirm it. I would suggest to the court that the way Judge Sheen, the circuit court here, approached this issue is contrary to what a panel of this court held in the precision dose cases, what you're not supposed to do. You're not supposed to look at a complaint and parse the allegations to distill it down to something which you can say, okay, that's covered, and ignore the totality of the allegations. Well, does the complaint – and this is an issue I've been having with this for some time – both you and counsel for the other parties keep talking about unintentional or unexpected. The policy is unintentional and. Correct. Very different than what's been argued. Judge Sheen talked about the intentional aspect because as he looked at those pleadings, that's all that's alleged. They don't talk about unexpected. They talk about intentional. They talk about intentional damages and the damages were a certainty because the district, who is the defendant, told everyone within its borders that had a contract with an alarm company, your contract's over. It's not just null and void, which is kind of a strange choice of words. Not that your contract's terminated or will be terminated or will come to an end or will lapse, but that it's null and void. If they hadn't corrected that, you wouldn't be here. They corrected that. That's correct. And we have to deal with what now exists. Right. And what the circuit court said was the circuit court looked at intentional conduct rather than the intentional damages because – No, the circuit court was pretty specific. It talked about intentional damages. There was some intentional conduct because, again, that's what you – somebody argued at the trial court level, but it did look at the policy. But it didn't look at unexpected because it's nowhere alleged. Anywhere. He looked at – he said certain of the claims do not require proof of intent. And he then said specifically the constitutional claims, that the alarm companies might be able to prove their claims without proving intent. He didn't look at the damages and the damages were a certainty because the contracts were over. And that's what the alarm companies complained about. They had existing contracts, some of which were for over 20 years or 25 years, they allege, and they're over. And he basically said because they don't have to prove intent for some of the claims, there's at least a potential for coverage. But that's not the complaint he had before him, and that's contrary to precision dose. There's – the allegations are clear that they acted intentionally and caused damages which were expected and intentional. You can't terminate a contract and not expect damage to one of the contracting parties. It was a certainty. It takes the fortuity out of insurance. It makes the insurance company the checkbook for the district for the purpose of a business decision gone bad. That's what the underlying case is. There's no risk. There's no allegation of fortuitous harm. There's no allegation of accidental conduct. It is intentional conduct which caused expected and intentional damage. With respect to – I'm sorry. Well, they're different. Unexpected and unintentional are very different, according to our Supreme Court in Bay State Insurance Company v. Wilson. They're different issues, and it's harder to prove unexpected than it is to prove intentional. Yes, there's a lesser standard for expected than there is for intentional. That's an assault case, if I recall. Well, I know, but it still talks about the two different issues. They're different. That's why I was having such problems reading through all these briefs because everybody's talking about or, or, or. That's not the issue here. We had it in the connective rather than the disjunctive. Your time has ended. I'm going to ask my colleagues if they have questions. Can I adjourn the time? Just a second. Thank you. You'll have an opportunity for rebuttal. Good morning, Your Honor. May it please the court and counsel. I'm Bernie Weiler. I'm the attorney for the Windfield Fire Protection District, and I have. You have? I have. You said Windfield. Because now I was very confused. I'm also the attorney for the Windfield Fire Protection District, which is meeting tonight. Thank you. So I had that on my mind. But Coa Pally has, and I have agreed that we will split our time equally. One of the things in reviewing the right to a defense. I need to say one other thing. Mr. Weiler, your brief as well as Chicago Metro's did the same thing. You're talking about or, or. And this isn't really consistent with the pleadings or the insurance company or the insurance policy. Correct. There's no question that the definition of wrongful act says unexpected and unintentional. Correct. There's no question that it is in the conjunctive. And I think it does have to be both. And so we have to apply that here where Judge Sheen looked at intentional. He really never even discussed unexpected. But is that because of the pleadings? Because the pleadings do talk about intentional acts. They do. But I think we need to look at what the type of coverage is. And if you look at the way that the insurance company here, American Alternative, has approached this, they have used all of the law that applies to cases that deal with occurrence policies. There are two different, this policy is 200 pages long and it has several parts. One is, and among those parts are two different parts of coverage that apply to different circumstances. One is a general liability coverage which indicates that personal injury property damage that results from an occurrence. An occurrence is defined as an accident. And an accident is defined as an unexpected or intentional event or an unintended event. So that the occurrence itself was not what was anticipated. And that's how the first brief looks, correct? That's how the insurance company has always approached this. And in looking at how you evaluate coverage and the duty to defend, you look in addition to all of the various principles of liberal construction and resolving all doubts in favor of the insured, you look at the purpose and the type of insurance that is being offered and contracted for. And in addition to occurrence for accidents, we're also covered for management liability coverage. And what this says is that that coverage says that we will pay those sums that the insured is obligated to pay as monetary damages for wrongful acts. And wrongful act is defined as any act, intentionally. Any act that you undertake, any act that was undertaken by the insured in the performance of its operations, that results unexpectedly and unintentionally in damages. So we are looking at what's covered here. We have an organization who is trying to provide a public, trying to carry out its public safety mission. It recognizes that in the course of doing that, it may do something wrong, that its acts may result in damages. And that's the coverage that has been provided by American Alternative. It says we are covering those acts that you administer. And what this complaint does is it says, here are the things that we think that you did wrong. And if you don't look at, you don't look at the pleader, you don't look at the pleader who says, these things mean to me that you intentionally tried to eliminate my business advantage in this marketplace. What you look at is what does a complaint allege that the district did? And there are seven things. There are seven enumerated acts that they did. They passed this ordinance. Now you look at what was the intent of that ordinance. Look at the ordinance. The ordinance was not intended for a business purpose. The ordinance on its face said it was for a public purpose. And when you look at the types of insurance that is being advanced, we look at the entire policy. And the entire policy contemplates that this question will come up that says, well, when you did that, did you really intend or expect to create a circumstance in which damages would occur? Not damage, not a fault, but a legal responsibility to pay damages. That's the way the insurance clause, the insurance clause is iterated. It's that this is our promise to pay, our promise that we're going to defend you because you may have hurt somebody. No, we're going to defend you in the event that there is a claim for damages, and we will pay those damages so that there's this legal responsibility. And if you look at the exclusion portions of it, it's contemplated that there may be a willful violation of the statute. And it says that if this is a willful violation of the statute, we don't cover you if you're willful. However, until it is determined or you admit or there is a judgment that it is willful, we will defend you. So this is what happens is that we have all of the time this type of coverage where people, where employees of a district or a municipality will conduct an arrest and in the course create a battery, violate someone's civil rights. Then the question is, did you do that intentionally or not? Well, until that is determined, we're entitled to be defended by that. We're saying we didn't intend to violate the Sherman Act. And if we violated the Sherman Act, that doesn't relate in damages to us. That doesn't result in damages to us because that will have to be determined under the provisions of the Clayton Act, and the Clayton Act immunizes us from those damages. What about the expected, unexpected aspect? Pardon me? What about the expected, unexpected aspect? Well, I think that the issue is, is that if the district, if the district expected that it was going to be, that this was going to be unlawful, there's no evidence that they expected that this would result. In fact, the contrary is true because... Isn't there a quantum of common sense to be applied here? That the district honestly believed that it could pass this ordinance and there would be no damages? Well, I think if you look at what was alleged, is that they indicated that we sent out this notice, okay? The first or the second? The first notice. Let's just talk about the first notice. What that said is, someone from that district determined that this ordinance means that we have the power to void your contracts. Now, that might be wrong. That might be wrong. They may have reached a conclusion about that, but in making that conclusion, it was, your contracts are void, and how can you have damages from a void contract? They may have made a wrong determination about that, but that is the wrongful act for which they are entitled to coverage. Okay? And until somebody says, by judgment, that you did this on purpose, okay, that you did this... What's the difference between on purpose and an expected result? Well, I think that if it has to be unintended, it has to be intentional and expected, okay? I think that's what Justice Hutchinson pointed out. It would be a lot easier if that's what it said, but it says unexpected and unintended. Unexpected and unintended. All right, and the question is, we're still entitled to a defense until that is determined, until we indicate volitionally that we expected this to happen. And one of the indications that it is unexpected is because this court had specifically reviewed an identical circumstances as it related to a municipality and said that this type of arrangement was lawful. It had no reason to expect that this would be unlawful. It had no reason to expect that there would be damages. We're entitled to be covered for all damages, for all counts, if we're entitled to be covered on one. And one of the, there's all kinds of issues on the Sherman Act, is was there a collusion? We're entitled to be, we're entitled to be defended on the basis of the Sherman Act if there was concert. We sent out a request for proposal. Everybody, including the defendants in the underlying claim, responded to that proposal. We did that. We didn't, we didn't call them up and say, let's, let's jointly do this. So we're, we're entitled, we're entitled to be defended under the Sherman Act as to whether or not there was a concert. So you're saying, you're ensuring at this point that factual determinations cannot be made on these, on these unexpected, unintended issues. They have a duty to defend until those factual underpinnings can be resolved. Absolutely. And that is in, in, in keeping with the arrangement with, with Maryland versus Peppers, which says that you do defer those situ, those, those determinations until the findings in the underlying case. Where is the, where is the federal lawsuit right now? Has it been remanded again? Yes. The federal lawsuit and the federal lawsuit, and I don't want to take up all of my time. The federal lawsuit is, all that has happened in the federal lawsuit is that there has been a determination that the district was without authority to, to, to implement this particular alarm system because it did not meet with NFPA standards. Okay. And the district didn't, there's no question that the district could not have anticipated that that would happen because it, because by virtue of the ordinance, it said that we were looking for a higher standard of protection. And that's what, that's what the, that's what the intent was. And that's what the expectation was. The fact that someone took exception to that and said that you intended to harm us and to create damages to us, we're entitled to a defense to that. We're entitled to a defense under the class of one constitutional claims that says that you have to eliminate all other altruistic purposes before, before you can have a class of one constitutional claim. We're, we're entitled to that defense. We're entitled to the defense under the Sherman Act. And that's gone up twice on appeal on slightly different issues. There has not been one word about whether or not there was collusion. The, the appellate court I think in dicta said, we can have this alarm system, you just can't be the only game in town. And then it's, it's sent back. Now, under the Sherman Act, even if we can be the only game in town, did we collude to create that? Did, did we conspire with someone else to create that? My whole point is that's got to be resolved in federal court. In the course of that trial, you're entitled to defense. However, if it's determined that you did intend or expect those damages, the insurance company here does not pay those damages. That's your responsibility. That there was an intentional, that there was an intentional violation of the Sherman Act. And I think we're entitled to that defense. And with regard to that exclusion, I just wanted to indicate, I do want to comment on the reply to that. Those cases in which they say that the exclusion does not apply, there were all cases in which there was an underinsured motorist, there was a claim for underinsured motorist coverage in a, in a umbrella liability policy. The court said there's no liability coverage or there's no uninsured motorist coverage. They said, well, it wasn't excluded. Well, there was no exclusion in that policy. The argument there is, in all of those cases, is there's no exclusion. And the court says, well, you can't say that the absence of an exclusion creates coverage that's not in the coverage. And those cases don't apply to this situation where we have coverage for any act that's created except a willful violation of a statute. And where there's willful violation of a statute, we will defend you from that allegation until it's determined that it was willful. Thank you. If there's other questions, I'll turn it over to counsel. No, I think we're okay for now. Thank you. Counsel? And although he took more than his minutes, we'll give you your time. Thank you, Your Honor. May it please the court, counsel? I'm Adam Kruse along with Jim Knippen. We represent Chicago Metropolitan Fire Prevention Company in this case. Basically, the underlying complaint against Chicago Metro in this case is full of allegations that Chicago Metro acted in concert with the district in enacting and implementing these two ordinances that the plaintiffs allege caused them damages. Enacting and implementing these ordinances is something that only the district as a unit of government has the power to do. Chicago Metro, as a private company, has no such power. And that's the only way that the plaintiffs in the underlying case can hold Chicago Metro liable for the enactment and implementation of these two ordinances is by alleging something like in concert liability or alternatively joint venture liability on the part of Chicago Metro for the acts of the district. And that's basically what's pled in the underlying federal complaints. And that has the effect of causing Chicago Metro to qualify as a blanket additional insurer under the district's policy with American Alternative. To be a blanket additional insurer, Chicago Metro simply must be a person or organization liable for the district's wrongful acts committed or alleged to have been committed by the district. And basically that's exactly what's pled in by the underlying plaintiffs in the federal case when they allege in concert liability. Under in concert liability, one tortfeasor becomes liable for the actions of all of those with whom he acted in concert. The act of one is the act of all. Does in concert take into account the allegations of monopoly and conspiracy? There may not be a conspiracy, but I know there's a monopoly somewhere because that would be one of the acts involved. Would that also take that into account? I believe so. I mean, I know it's alleged in the federal complaint and it's incorporated into every count that there is some sort of in concert liability. And so, yes, I would argue that it would. So basically under in concert theory of liability, Chicago Metro could be liable for the district's wrongful acts in enacting and implementing the ordinances, even though Chicago Metro itself has no power as a private company to enact or implement those ordinances. And the same could basically be said for the alternative legal theory of a joint venture. The allegations of the underlying complaint basically support the theory that Chicago Metro and the district entered into a joint venture for the district to become the exclusive fire alarm monitoring provider within its boundaries, with Chicago Metro selling and installing the equipment in the district and maintaining that equipment. So if such a joint venture is proved, then, again, Chicago Metro could be held liable to the plaintiffs in the underlying case for the wrongful acts of the district done in the course of that joint enterprise. Well, policy language is pretty unambiguous, isn't it? Does any organization liable for the wrongful acts? So you're saying it's pretty obvious, right? I would agree that it's pretty obvious. And I just want to comment on a couple of points made by counsel on this issue. Counsel first made the argument that in order to be a blanket additional insured, Chicago Metro has to be blameless, I think was his word. And basically, if you look at the actual requirements of this policy, the actual policy language doesn't support that kind of interpretation in this case. And Chicago Metro simply has to be a person or organization liable for the district's utter wrongful acts, committed or alleged to have been committed by the district to the extent of that liability. There are other cases with different policy language that has found certain requirements of blamelessness, but that policy language isn't in this case. I will comment, though, that under at least joint venture liability, that certainly would allow Chicago Metropolitan to be found blameless as long as they were in the course of the joint venture and still be liable for the acts of the district. That wasn't even argued in the appellant's brief. They focused only on in concert liability. And I would argue that the same could be said for in concert liability, that there's no requirement of blame on the part of Chicago Metro for Chicago Metro to be held liable for the enactment and the implementation of the ordinance. Well, are they arguing that you really need to be an innocent bystander? Is that sort of what AAIC is arguing? That is basically what I would interpret their argument as being, that we need to be essentially respondeat superior, that we are liable simply because of some sort of agency-type relationship and that Chicago Metro is liable through no fault of its own. I think the policy is broader than that. And the other point that I would bring up is in response to counsel's argument that the complaint never alleges joint venture or vicarious liability, I would bring up the fact that this is federal notice pleading. Even though it's a fairly detailed complaint under federal notice pleading, I believe that the allegations of this complaint are broad enough to support vicarious liability under a joint venture or in concert liability. I believe that the allegations of this complaint are plainly broad enough to support joint venture liability on the part of Chicago Metro if the allegations are proven. And under decisions such as Solo Cup versus federal insurance company where there can be, where the allegations are broad enough to incorporate different conduct on the part of the blanket additional insured versus the person who actually commits the acts, that essentially would result in Chicago Metro being defended under the blanket additional insured enforcement. Thank you very much. Thank you very much. Mr. Timmers. We've spent time, so take the time you need. Justice Hutchinson, with respect to the question about damages concerning the second ordinance, I refer to the court just for your notes. Paragraph 103 of the supplemental complaint where they allege that under the new ordinance, while the radio transmission function would be performed by private alarm contractors, the district would still have sole control of the alarm monitoring function with Chicago Metro's active participation that not only eliminates a key service by the alarm companies, but also diminishes the alarm company's ability to keep fire alarm systems operational. They then allege that they still have a 100% monopoly. Justice Georgeson, you asked about a quantum of common sense. To think that a notice from a municipal body such as the district to 400 commercial accounts telling them that their contracts with the alarm companies are over because the district says they are, doesn't cause damages to turn common sense on its head. With respect to the argument by counsel for the district, he talks about an exception and an exclusion rather than focus on the issue. The issue in this court is, was there a wrongful act? And if there was no wrongful act, then the judgment as to both defendants should be reversed because then there clearly can be no coverage for Chicago Metro. But there's no exclusion.  We don't argue an exclusion. And as this court knows from many, many coverage cases, it's resolved. For an exclusion to apply, there must be coverage, which means there must be a wrongful act. Also, an exception within an exclusion is not a coverage grant. We don't rely on an exclusion. If we did, we'd have the burden of proving that the claim falls within an exclusion. We don't assert an exclusion. They say there's an exception to an exclusion, and that somehow gives them coverage because the exclusion says if you're relying on an intentional act exclusion, you still have a duty to defend until it's established whether the conduct falls within the exclusion. We don't rely on the exclusion. We're saying to this court there is no wrongful act. We look at the insuring agreement and say the insuring agreement has not been complied with, has not been triggered by the allegations of a verified complaint. And there's no wrongful act because? There is no wrongful act because the damages clearly are expected and intended, or they are not unexpected or unintended. And unintended. That is correct. And we hear from Chicago Metro. Chicago Metro says, well, that's okay. The court should look at solo cuts. Why would this court, an Illinois appellate court, look at a more than 30-year-old Seventh Circuit case that dealt with a peppers issue? This case isn't a peppers case. This case is, do the allegations of the underlying complaint allege a wrongful act? If they don't, the carrier wins. If they do, then you decide if Chicago Metro is an additional insurer. You win in terms of coverage. No duty to defend. It's no duty to defend even if it has not been determined yet. If you decide that the allegations of the verified pleading submitted by the alarm company do not allege a wrongful act because they allege damages, they allege conduct which was certain to give rise to a claim for damages, and the damages were neither unexpected nor unintended, which is another way of saying that they were expected and intended, then there's no wrongful act, then there is no duty to defend. If there's no duty to defend, there will never be a duty to indemnify. But how can we, I mean, we have to be careful in deciding this particular case that we do not decide the ultimate issues in the federal case. Well, you will not decide those. Well, there are lots of them, but we can't even go in that direction. So how can we decide, if it was on that first issue, that first notice, as I said, you wouldn't be here. But we're not on the first notice anymore. We're on the second ordinance, and that's the issue that's really now before us. We're not prepared, and we can't decide that there was or wasn't a wrongful act. Well, what Your Honors can certainly do is you can say that there was no wrongful act with respect to the first ordinance, and you can afford to do it. But there's no reason to. That's over. Well, it's not over. My client spent millions of dollars defending that underlying case, and if the court says that there wasn't a wrongful act with respect to the first ordinance, we have a count in our complaint that Judge Sheen never addressed, which is the reimbursement of defense costs directed at Chicago Metro. That is worth millions of dollars to my client. But it has nothing to do with the district at this point.  With that having been said, the court needs to focus, as Your Honors well know, on the allegations of the complaint, and if they do not allege a wrongful act, that is to say if they do not allege misfeasance, malfeasance, or nonfeasance that led directly to damages which were expected and intended, if that's what they led to, then there is no duty to defend because there is no wrongful act, and the insuring agreement has not been satisfied. If there's no wrongful act, then Chicago Metro is not an additional insurer. And it's interesting. Chicago Metro, no one has ever contended this policy is ambiguous. This policy, in my opinion, is a model of clarity. This policy says that to be an additional insurer, you have to be blameless because it doesn't cover the additional insurer for its own negligence or other acts or omissions. It covers it solely, solely for its responsibility in blameless nature with respect to the acts or omissions of the negligent. And it's much unlike what this court faced in Pekin Insurance v. Hallmark where the court said the complaint there had a potential, a potential for Section 414 restatement towards supervision of a sub by the general. Therefore, there should be a duty to defend because of that potentiality. But that panel was reined in by a subsequent panel in the Precision Dose case which said you can't do that. You can't look at the imaginary complaint. You have to look at the complaint before you, and that is the complaint that determines whether there's a duty to defend. The two pleadings before this court don't admit of a duty to defend, and we would suggest to the court the circuit court erred, and the judgment should be reversed. Thank you. Thank you. Gentlemen, thank you this morning for argument and this afternoon now. We will make a decision in due course, and we will now stand adjourned. Thank you.